******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# COMMISSIONER OF MENTAL HEALTH AND ADDICTION SERVICES ET AL. *v.* FREEDOM OF INFORMATION COMMISSION ET AL.
## (SC 20686)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Keller and Cradle, Js.*

*Syllabus*

Pursuant to statute (§ 52-146e (a)), "communications and records as defined in section 52-146d shall be confidential" and "no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient . . . without the consent of the patient or his authorized representative."

Pursuant further to statute (§ 52-146d (2)), the phrase "communications and records" is defined as "all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ."

The plaintiffs, the Commissioner of Mental Health and Addiction Services and the Department of Mental Health and Addiction Services (DMHAS), appealed to the trial court from the decision of the named defendant, the Freedom of Information Commission (commission), which ordered the disclosure, without redaction, of a police report to the defendant newspaper and its reporter, which the reporter had requested pursuant to the Freedom of Information Act (FOIA). The police report concerned the death of a patient, P, after a medical event at the Whiting Forensic Division of Connecticut Valley Hospital (Whiting), which is a maximum security, mental health treatment facility operated by DMHAS. DMHAS has its own police department, which is stationed at Whiting. The police report consisted of a collection of investigative reports, authored by DMHAS police officers, documenting the police department's investigation into P's death. In ordering disclosure, the commission concluded that the police report was not exempt from disclosure under the provision (§ 1-210 (b) (10)) of FOIA that exempts from disclosure communications privileged by the doctor-patient or therapist-patient relationship or any other common-law or statutory privilege. The commission reasoned that the police report did not relate to the diagnosis or treatment of P's mental health condition within the meaning of those terms, as set forth in § 52-146d (2), insofar as the officers who prepared the report had not participated in the diagnosis or treatment of P's mental health condition. The commission also concluded that disclosure of the police report did not violate the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (42 U.S.C. § 1320d et seq.), as implemented by the Privacy Rule (45 C.F.R. § 160.101 et seq.), which generally prohibits a "covered entity" from disclosing protected "health information" without a valid authorization. The trial court sustained in part the plaintiffs' appeal from the commission's decision. The court concluded that the police report fell within the definition of "communications and records" in § 52-146d (2) because the report was prepared at a mental health facility and related to the treatment of a patient's mental health condition, but it nonetheless determined that the report could be disclosed so long as anything therein that identified a patient was redacted in accordance with § 52-146e (a). The court also concluded that, although the police report was prepared by a "covered entity" and contained "health information" within the meaning of HIPAA and the Privacy Rule, it could be released, pursuant to those provisions, only after references

to any patient's identity and personally identifying health information were redacted. Thereafter, the commission appealed and the plaintiffs cross appealed from the trial court's judgment, seeking a determination as to whether the police report at issue was exempt from disclosure under FOIA, either because it was protected by the psychiatrist-patient privilege set forth in §§ 52-146d (2) and 52-146e (a), or by HIPAA and the Privacy Rule. *Held*:

1. Although the police report itself was not exempt from disclosure under § 1-210 (b) (10) of FOIA, as it was not a privileged psychiatrist-patient communication under §§ 52-146d (2) and 52-146e (a), this court ordered the redaction of certain information contained therein prior to disclosure:

a. This court concluded that the police report was not a communication or record thereof under § 52-146d (2):

It was clear from the plain language of §§ 52-146d (2) and 52-146e (a) that the psychiatrist-patient privilege applies only to communications or records thereof that relate to the diagnosis or treatment of a patient's mental health condition and that are between individuals who fall within the three categories of communicants delineated in § 52-146d (2), namely, the patient and a psychiatric mental health provider, a member of the patient's family and a psychiatric mental health provider, or one of those individuals and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of the patient's diagnosis and treatment.

Moreover, this court clarified that not every communication involving or concerning a psychiatric patient necessarily relates to the diagnosis or treatment of that patient's mental health condition and rejected the notion that its case law stood for the broad proposition that the psychiatrist-patient privilege prohibits the disclosure of all communications and records that are made or prepared at a mental health facility and that identify a patient, regardless of the identities of the individuals between whom the communication is made.

In the present case, the police report, which was prepared after P stopped receiving treatment at Whiting, was not a part of P's clinical file, and, in view of the nature and timing of the postmortem investigation conducted by the DMHAS police officers, it was clear that the officers who prepared the report were not participating in the accomplishment of the objectives of diagnosis and treatment when they prepared the report but, instead, were performing the traditional law enforcement function of investigating an untimely death.

Furthermore, there was no merit to the plaintiffs' claim that the phrase "wherever made, including communications and records which occur in or are prepared at a mental health facility" in § 52-146d (2) expanded the definition of "communications and records" to encompass all communications and records that are made or prepared in a mental health treatment facility and that relate to the diagnosis or treatment of a patient's mental condition, regardless of the identity of the individuals between whom the communications are made, as the legislative history and purpose of § 52-146d demonstrated that that phrase was not intended to create a freestanding category of confidential communications and records unique to mental health facilities but, instead, to clarify that the psychiatrist-patient privilege was not limited to communications between patients and private psychiatrists but also extended to communications relating to psychiatric treatment provided at publicly funded institutions that offer inpatient treatment.

In addition, in enacting FOIA, the legislature balanced competing principles concerning governmental transparency and patient confidentiality and provided, as it deemed appropriate, for certain exemptions from disclosure to protect patient confidentiality, and the decision as to whether the public policy of this state would best be served by creating a blanket exemption from disclosure of all records and documents relating to patients at Whiting rested with the legislature rather than this court.

b. There was substantial evidence in the administrative record to support the commission's finding that the police report was not a communication or record thereof, as those terms are defined in § 52-146d (2):

The police report, which related to and was generated after the death of a patient at Whiting, was not a communication between any of the individuals who are included in the three categories of communicants delineated in § 52-146d (2), as the report did not constitute a communication between a patient or a member of a patient's family and a psychiatric mental health provider, or between any such person and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of the patient's diagnosis and treatment.

Rather, the police report was a communication between DMHAS police officers tasked with investigating P's death and an unknown recipient or recipients.

Moreover, regardless of who the intended recipient of the police report was, in view of the death of P, who was the subject of the report, it was clear that the officers were not participating in the accomplishment of the objectives of P's diagnosis and treatment when they prepared the report but, rather, were performing the traditional law enforcement function of investigating an untimely death and reporting the results of their investigation, and this court could not conclude that the commission acted arbitrarily, illegally, or in abuse of its discretion in determining that the police report was not a communication or record within the meaning of the statutory scheme.

Furthermore, although some DMHAS police officers responded to the emergency medical event involving P, it was unclear whether they were participating in their capacity as a member of the mental health treatment team or, alternatively, performing the traditional law enforcement function of responding to an emergency, and, in light of that ambiguity, this court could not substitute its own judgment for that of the commission.

Nevertheless, because the police report contained sensitive information regarding the identity of two patients, namely, the names, dates of birth, and home phone numbers of P and a second patient who witnessed the medical event that led to P's death, and because the newspaper reporter explicitly stated in his FOIA request that all references to a patient's identity could be redacted, the commission improperly ordered the disclosure of that identifying information over the plaintiffs' objection, and, accordingly, this court ordered that all references to patient names, dates of birth, and home phone numbers be redacted from the report prior to disclosure.

2. The police report was not exempt from disclosure under HIPAA and the Privacy Rule:

The commission's interpretation of the Privacy Rule was not entitled to deference, as the Privacy Rule was promulgated by the United States Department of Health and Human Services, and such deference was not warranted when, as in the present case, the agency interpreting the regulation, namely, the commission, was not responsible for its promulgation.

The Privacy Rule contains various exemptions, including one that permits a covered entity to use or disclose protected health information without a valid authorization to the extent that such use or disclosure is "required by law," and that term is defined to expressly include statutes or regulations that compel an entity to use or disclose protected health information.

Even if this court assumed that, under the Privacy Rule, the DMHAS Police Department was a "covered entity" and that the police report contained "health information," the police report was not shielded from disclosure under HIPAA because its release was "required by law" under FOIA, which is a state statute that requires the disclosure of public records, and the police report, therefore, had to be disclosed, provided that the names, dates of birth, and home phone numbers of the patients mentioned therein were redacted.

(*One justice concurring in part and dissenting in part*; *two justices dissenting in one opinion*)

Argued September 8, 2022—officially released August 29, 2023

*Procedural History*

Appeal from the decision of the named defendant determining that the plaintiffs had violated the requirements of the Freedom of Information Act and ordering that they comply with those requirements by disclosing certain records to the defendant The Hartford Courant et al., brought to the Superior Court in the judicial district of New Britain and tried to the court, *Cordani, J.*; judgment sustaining the appeal in part, from which the named defendant appealed and the plaintiffs cross appealed. *Reversed in part*; *judgment directed*.

*Valicia Dee Harmon*, commission counsel, for the appellant-cross appellee (named defendant).

*Alma Rose Nunley*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Clare Kindall*, former solicitor general, and *Emily V. Melendez*, assistant attorney general, for the appellees-cross appellants (plaintiffs).

*Opinion*

ECKER, J. This appeal presents the issue whether a police report created by the police department at the Whiting Forensic Division of Connecticut Valley Hospital (Whiting)[1] is subject to disclosure under the Freedom of Information Act (FOIA), General Statutes § 1-200 et seq. The police report at issue documented the police department's investigation into the death of a patient at Whiting after a medical event. The named defendant, the Freedom of Information Commission (commission), appeals from the judgment of the trial court, which ordered the disclosure of a redacted version of the police report under FOIA, claiming that the report should be released in its entirety because it is not exempt from disclosure by (1) the psychiatrist-patient communications privilege codified at General Statutes §§ 52-146d (2) and 52-146e (a), or (2) the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d et seq., as implemented by the Privacy Rule, 45 C.F.R. § 160.101 et seq. The plaintiffs, the Commissioner of Mental Health and Addiction Services and the Department of Mental Health and Addiction Services (DMHAS), disagree and cross appeal, claiming that the police report should not be released at all, even in redacted form, because it is protected by the psychiatrist-patient communications privilege and HIPAA.

We conclude that the police report is not a communication or record, as those terms are used in § 52-146e (a), and, therefore, is not exempt from disclosure under FOIA. Nonetheless, the police report includes information that would identify a patient at Whiting, even though such information specifically was excluded from the FOIA request, and the report therefore should be redacted in the manner described in part III A 2 of this opinion. Because the police report, with minimal redaction, must be disclosed pursuant to FOIA, we further conclude that it is not protected from disclosure by HIPAA and its implementing Privacy Rule. Accordingly, we reverse in part the judgment of the trial court.

I

FACTS AND PROCEDURAL HISTORY

On November 9, 2017, Josh Kovner, a reporter with The Hartford Courant,[2] submitted a FOIA request to DMHAS, asking for the release of "DMHAS Police Department incident reports on any and all deaths in 2016 of Whiting . . . patients that were deemed 'accidental' by the [state] medical examiner's office, including, but not limited to, [the] death of a patient on Dec[ember] 1, 2016. At the time, in reference to the Dec[ember] 1, 2016, death, DMHAS said in a statement that the patient 'died due to a medical event.' " In his request, Kovner added that "[a]ll references to the identity of a patient can be redacted."

DMHAS denied Kovner's request, explaining that the

responsive public record was exempt from disclosure under FOIA on three grounds: (1) it was protected by the psychiatrist-patient communications privilege codified at §§ 52-146d (2) and 52-146e (a); see General Statutes § 1-210 (b) (10); (2) it constituted "[p]ersonnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy"; General Statutes § 1-210 (b) (2); and (3) HIPAA's Privacy Rule "also prohibit[ed] the release of personal health information without the consent of the patient or the authorized representative."

Kovner filed a complaint with the commission challenging the denial of his FOIA request. The hearing officer conducted an evidentiary hearing, at which DMHAS submitted the police report, in both redacted and unredacted form, for in camera inspection. Additionally, DMHAS adduced the testimony of Diana Lejardi, its public information officer. Lejardi explained that Whiting is a "maximum security unit" that provides "specialized forensic services" to patients who are "involved in . . . legal matters" and "have severe mental illness . . . ." Patient treatment was overseen by Michael Norko, a forensic psychiatrist. "DMHAS has its own police department," which is "specifically trained for DMHAS" and "located in different facilities, including in Whiting . . . ." According to Lejardi, DMHAS employs its own police force "for a number of reasons. One [is] because it is a maximum security unit, and they do general screening of people entering and exiting the facility. And, in addition . . . because [it] is a maximum security unit . . . there are, at times, patients with severe behaviors [who] may require some type of . . . interaction [with] or . . . assistance from . . . DMHAS police. So, staff may call a code, which would require . . . [the] police to respond."

At the hearing, Lejardi was asked whether DMHAS police reports are used to make decisions about patient diagnosis or treatment, and she responded that she did not "have enough knowledge" to answer that question. When asked whether it was likely that a police report would be used in the diagnosis or treatment of a patient, Lejardi answered: "I think it is likely that they can take reports because [that's] what . . . [the] police do— there are times [when] there are events between patients in which [the] police will take witness statements. . . . [W]e have to remember [that] these are patient[s] . . . with severe mental illness . . . [a]nd/ or substance use disorders. . . . [S]o, in the course of a witness statement . . . there may be information gathered that is used . . . or [that] the medical team or treatment team may use . . . or further explore at least." Lejardi acknowledged, however, that information in a police report "obviously . . . would not be used to make the diagnosis or treatment of the [patient] . . . [i]f the person passed away."

Following the hearing and in camera inspection of the police report, the hearing officer issued a written decision, finding that the police report was subject to disclosure without redaction under FOIA. The hearing officer's decision was adopted unanimously by the commission. In arriving at its conclusion, the commission recognized that the police report "contain[s] the name or other identifying information of a patient" but determined that it was not protected by the psychiatrist-patient communications privilege on the ground that "the police officers [did] not participate in the diagnosis or treatment of a patient's mental condition . . . ." Because "none of the requested records [was] between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment," the commission concluded that the police report did not "relate to the diagnosis or treatment of a patient's mental condition, within the definition[s] set forth in [§§] 52-146d (2) [and 52-146e (a)]."[3] The commission also found that the police report was not exempt from disclosure under the personal privacy exemption in § 1-210 (b) (2).[4]

As for the claim of exemption under HIPAA, the commission concluded that HIPAA was inapplicable because the DMHAS police department is not a "covered entity" and the police report did not include "health information," as defined by 45 C.F.R. § 160.103. Alternatively, even if HIPAA applied, the commission determined that the police report was subject to disclosure under the exemption in 45 C.F.R. § 164.512 (a), which provides that "[a] covered entity may use or disclose protected health information to the extent that such use or disclosure is required by law and the use or disclosure complies with and is limited to the relevant requirements of such law." Because FOIA requires the disclosure of public records in the absence of an applicable exemption, and there was no applicable exemption in this case, the commission concluded that the police report was not protected by HIPAA.

DMHAS appealed from the decision of the commission to the Superior Court pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-183. The trial court concluded that "communications and records" in § 52-146d (2), which defines the operative terms of the statutory privilege in § 52-146e (a), broadly encompasses all "records that occur in, or are prepared at, a mental health facility relating to the treatment of a patient's mental condition . . . ." Because Whiting is a mental health facility, the subject of the police report was a patient at Whiting, the DMHAS police department is a specialized force stationed and employed at Whiting, and the provision of mental health treatment services at Whiting depends on the presence

of the DMHAS police, the trial court concluded that the police report came within the scope of the statutory privilege, insofar as it was "prepared at a mental health facility" and "relate[d] to the treatment of the mental condition of a patient" within the meaning of § 52-146d (2). The hearing officer's determination to the contrary was "not supported by substantial evidence in the record and [was] a clear error of law."

The trial court nonetheless concluded that the police report could be disclosed with redaction to remove information that would "identify a patient" in accordance with § 52-146e (a). (Footnote omitted.) The analysis of whether a public record identifies a patient, the trial court stated, "does not take into consideration what the public may or may not know . . . ." Instead, the statutory focus in § 52-146d (4) is on the public records themselves and the "names or other descriptive data" they contain, "from which a person acquainted with the patient might reasonably recognize the patient as the person referred to . . . ." General Statutes § 52-146d (4) (A).[5] After reviewing the police report in camera, the trial court concluded that "a redacted form of the record [could] be provided without identifying the patient."

With respect to HIPAA, the trial court concluded that the police report was prepared by a "covered entity" because Whiting and DMHAS are both health care providers. The trial court further concluded that the police report contained "health information," as defined by HIPAA, because it identified a mental health patient and contained "information concerning the patient's physical and mental health." Although the consent of the patient or his authorized representative had not been provided in accordance with HIPAA, the trial court nonetheless concluded that the police report could be released consistent with HIPAA following the redaction of references to the patient's identity and personally identifying health information.

This appeal and cross appeal followed.[6] On appeal, the parties renew the claims they raised before the commission and the trial court, asking us to determine whether the police report is exempt from disclosure under FOIA because it is protected by the psychiatrist-patient communications privilege and/or HIPAA's Privacy Rule.

## II

### STANDARD OF REVIEW

The standard of review applicable to agency decisions under the UAPA is well established. "Our review of an agency's factual determination is constrained by . . . § 4-183 (j), which mandates that a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. . . . [I]t is [not] the function of the trial court [or] of this court

to retry the case . . . . An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review." (Internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, 266 Conn. 492, 503–504, 832 A.2d 660 (2003).

Even with respect to conclusions of law, "[t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . [Thus] [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Internal quotation marks omitted.) *Meriden* v. *Freedom of Information Commission*, 338 Conn. 310, 318–19, 258 A.3d 1 (2021).

We will defer to an agency's construction of a statute or administrative regulation if the language at issue is ambiguous and the agency's construction is time-tested, reasonable, and previously has been subject to judicial scrutiny. See, e.g., *Marone* v. *Waterbury*, 244 Conn. 1, 9–10, 707 A.2d 725 (1998) (even if agency's interpretation of statute is time-tested because "the agency has consistently followed its construction over a long period of time, the statutory language is ambiguous, and the agency's interpretation is reasonable," agency's interpretation is not entitled to special deference if it "has not previously been subject to judicial scrutiny" (internal quotation marks omitted)). When the statute or regulation at issue is not ambiguous, or the agency's construction of the statute or regulation is not time-tested, reasonable, or has not previously been subjected to judicial scrutiny, "we apply a broader standard of review . . . ." (Internal quotation marks omitted.) Id., 10.

The commission does not claim that its construction of the psychiatrist-patient communications privilege in §§ 52-146d (2) and 52-146e (a) is entitled to deference, but it does claim that its construction of HIPAA's Privacy Rule is entitled to deference because it "has construed HIPAA's regulatory scheme consistently and rea sonably for years." DMHAS responds that "such deference is not afforded [when] an agency is interpreting a different agency's statute or regulations." In *Commissioner of Correction* v. *Freedom of Information Commission*, 307 Conn. 53, 52 A.3d 636 (2012), we held that it is only "the interpretation of the promulgating agency . . . [that] is entitled to deference by this court" because an

agency that did not promulgate the regulations under review does not have "special expertise" in the subject matter of the regulations or the intent that prompted their promulgation. Id., 65; see id. (declining to defer to commission's interpretation of regulations promulgated by United States Department of Justice Immigration and Naturalization Service because "[t]he commission has no special expertise in federal immigration law, in federal criminal law enforcement policies and procedures, or in questions of national security, which matters are the subject of the regulation," and "the intent of our state legislators when setting policy and enacting laws regarding access to public records in this state has no bearing on the intent of the federal agency that promulgated the regulation"). We agree with DMHAS that the commission's interpretation of the Privacy Rule, which was promulgated by the United States Department of Health and Human Services, is not entitled to deference.

Thus, the scope of the psychiatrist-patient communications privilege codified at §§ 52-146d (2) and 52-146e (a) and in HIPAA's Privacy Rule are questions of law, which we review de novo. See, e.g., *Commissioner of Public Safety* v. *Freedom of Information Commission*, 301 Conn. 323, 337–38, 21 A.3d 737 (2011). Our analysis of §§ 52-146d (2) and 52-146e (a) is governed by the principles of statutory construction set forth in General Statutes § 1-2z. With respect to HIPAA's Privacy Rule, "principles of comity and consistency require us to follow the [federal] plain meaning rule," as construed by the federal courts. (Internal quotation marks omitted.) *Szewczyk* v. *Dept. of Social Services*, 275 Conn. 464, 474–75, 881 A.2d 259 (2005); see *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 117–18, 202 A.3d 262 (discussing federal plain meaning rule), cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019).

### III

### FOIA

Section 1-210 (a) of FOIA provides in relevant part that, "[e]xcept as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to" inspect, copy, and receive a copy of such records, subject to the exemptions enumerated in subsection (b) of the statute. We consistently have held that "the long-standing legislative policy of [FOIA] favoring the open conduct of government and free public access to government records . . . requires us to construe the provisions of [FOIA] to favor disclosure and to read narrowly that act's exceptions to disclosure." (Citations omitted; internal quotation marks omitted.) *Waterbury Teachers Assn.* v. *Freedom of*

*Information Commission*, 240 Conn. 835, 840, 694 A.2d 1241 (1997). The exemptions contained in FOIA "reflect a legislative intention to balance the public's right to know what its agencies are doing, with the governmental and private needs for confidentiality. . . . [I]t is this balance of the governmental and private needs for confidentiality with the public right to know that must govern the interpretation and application of [FOIA]. . . . Our construction of [FOIA] must be guided by the policy favoring disclosure and exceptions to disclosure must be narrowly construed. . . . [T]he burden of proving the applicability of an exemption rests [on] the agency claiming it." (Citations omitted; internal quotation marks omitted.) *Commissioner of Emergency Services & Public Protection* v. *Freedom of Information Commission*, 330 Conn. 372, 383–84, 194 A.3d 759 (2018); see *Lieberman* v. *State Board of Labor Relations*, 216 Conn. 253, 266, 579 A.2d 505 (1990) ("[i]n those limited circumstances [in which] the legislature has determined that some other public interest overrides the public's right to know, it has provided explicit statutory exceptions . . . [that] must be narrowly construed" (citation omitted)).

## A

### Psychiatrist-Patient Communications Privilege

The parties dispute whether the police report at issue in this appeal is exempt from disclosure under subsection (b) (10) of § 1-210, which provides in relevant part that "[n]othing in [FOIA] shall be construed to require disclosure of . . . communications privileged by the . . . doctor-patient relationship, therapist-patient relationship or any other privilege established by the common law or the general statutes . . . ." The only applicable communications privilege raised by DMHAS is the statutory psychiatrist-patient communications privilege contained in §§ 52-146d (2) and 52-146e (a).

Our analysis of the exemption for psychiatrist-patient communications proceeds in two parts. Because the only information that is privileged under § 52-146e (a) is "the substance or any part or any resume"[7] of "communications and records as defined in section 52-146d," we first address the definition of "communications and records" in § 52-146d (2) to determine the scope of the privilege. Second, we address whether there is substantial evidence in the administrative record to support the commission's finding that the police report is not a communication or record, as defined by § 52-146d (2).

### 1

### Definition of "Communications and Records" in § 52-146d (2)

The psychiatrist-patient communications privilege did not exist at common law and is entirely a creature of statute. See *Zeiner* v. *Zeiner*, 120 Conn. 161, 167, 179 A. 644 (1935) ("[i]n this [s]tate, information acquired

by physicians in their professional capacity ha[d] never been privileged"). The purpose of the psychiatrist-patient communications privilege "is to protect a therapeutic relationship. The statute provides a privilege for confidential communications so that a patient may safely disclose to his therapist personal information that is necessary for effective treatment or diagnosis. . . . Communications that bear no relationship to the purpose for which the privilege was enacted do not obtain shelter under the statute and are [not privileged]." (Citation omitted.) *Bieluch* v. *Bieluch*, 190 Conn. 813, 819, 462 A.2d 1060 (1983); see *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 195, 663 A.2d 1001 (1995) ("the principal purpose of [the] privilege is to give the patient an incentive to make full disclosure to a physician in order to obtain effective treatment free from the embarrassment and invasion of privacy [that] could result from a doctor's testimony" (internal quotation marks omitted)).[8]

We begin our analysis, as we must, with the language of §§ 52-146d (2) and 52-146e (a). See General Statutes § 1-2z. The textual focus of § 1-2z is consistent with the cardinal and long-standing rule of statutory construction that courts may not overlook the text of a statute in order to advance unarticulated policy considerations, even if those policies are salutary and advisable. See, e.g., *Trinity Christian School* v. *Commission on Human Rights & Opportunities*, 329 Conn. 684, 697–98, 189 A.3d 79 (2018) ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language" (internal quotation marks omitted)). Upon careful examination, the text of §§ 52-146d (2) and 52-146e (a) goes a long way toward resolving this appeal.

Section 52-146e (a) expressly limits the scope of the privilege to "communications and records as defined in section 52-146d . . . ." Section 52-146d (2), in turn, provides that " '[c]ommunications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ." See also General Statutes § 52-146d (5) (defining "mental health facility" as "any hospital, clinic, ward, psychiatric mental health provider's office or other facility, public or private, which provides inpatient or outpatient service, in whole or in part, relating to the diagnosis or treatment

of a patient's mental condition'').

It is clear from the plain language of this statutory definition that the legislature limited the psychiatrist-patient communications privilege in three important respects. First, the privilege applies only to communications and records *thereof*, which means records *of communications*.[9] Of course, the definition includes more than oral and written communications and records documenting such communications, because records can themselves be (or become) communications. For example, information documented in a patient's medical file—such as a provider's clinical observations and treatment notes, orders relating to medications or treatment, and lab test results—can constitute communications from one mental health provider to another regarding a patient's diagnosis and treatment. With that caveat, however, the statutory text leaves no room for debate that only communications and records of communications are privileged under §§ 52-146d (2) and 52-146e (a) and exempt from disclosure under FOIA.

Second, the communication or record thereof must "relat[e] to" the diagnosis and treatment of a patient's mental condition. General Statutes § 52-146d (2). As we previously have observed, "the term 'relating to' uniformly has been given a broad meaning . . . ." (Footnote omitted.) *Brennan* v. *Brennan Associates.*, 293 Conn. 60, 79, 977 A.2d 107 (2009); see *Lombardo's Ravioli Kitchen, Inc.* v. *Ryan*, 268 Conn. 222, 233, 842 A.2d 1089 (2004) (referring to definition of "related" in Webster's Third New International Dictionary as "having relationship: connected by reason of an established or discoverable relation" (internal quotation marks omitted)). We must nevertheless remain cognizant that the breadth of this term does not mean that every communication involving or regarding a patient under psychiatric care—even a patient hospitalized in a mental health facility—will relate to the diagnosis and treatment of a patient's mental health condition. See, e.g., *State* v. *Montgomery*, 254 Conn. 694, 725, 759 A.2d 995 (2000) (statement of person hospitalized in mental health facility "bore no relation to . . . diagnosis or treatment"). Section 52-146d (2) provides that the communication or record thereof is privileged only if it relates to the diagnosis and treatment of a patient's mental condition.

Third, the communication or record thereof must be between individuals identified in the following three categories of communicants delineated in § 52-146d (2): (1) "the patient and a psychiatric mental health provider"; (2) "a member of the patient's family and a psychiatric mental health provider"; and (3) the patient, the psychiatric mental health provider, or the patient's family member, and "a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications

and records which occur in or are prepared at a mental health facility . . . ." With respect to the third category of communicants, the use of the present participle "participating"[10] plainly means that the person from whom or to whom the communication is made must actually be involved "in the accomplishment of the objectives of diagnosis and treatment . . . ." General Statutes § 52-146d (2). Only a communication or a record of a communication between individuals identified in these three categories is protected by the psychiatrist-patient communications privilege. Communications or records of communications between other individuals, or those that are unrelated to the diagnosis and treatment of a patient's mental condition, are not privileged psychiatrist-patient communications and, therefore, are not protected from disclosure under FOIA.

Our prior case law on the subject helps illuminate the nature and scope of these three limitations. In *State* v. *Montgomery*, supra, 254 Conn. 721–25, we considered whether statements made by a patient at a mental health facility were communications or records protected from disclosure by the psychiatrist-patient communications privilege. In that case, a psychiatrist at Cedarcrest Hospital had assigned Elaine Janas, a mental health assistant, to monitor a mental health patient, Tyrone Montgomery. See id., 722–23. While monitoring Montgomery, Janas overhead him make a statement to an unknown third party over the telephone in an alleged attempt to concoct a false alibi regarding his involvement in a murder. Id., 723. At Montgomery's later criminal trial, the state sought to admit Janas' testimony regarding Montgomery's inculpatory statement. Id. We held that Montgomery's statement was not a protected communication because it was not a communication "between [Montgomery] and a psychiatrist or Janas, but, rather, between [Montgomery] and an unknown third party located outside of the hospital" that "bore no relation to [Montgomery's] diagnosis or treatment." Id., 725. The "mere fact[s]" that Montgomery's statement was made in a mental health institution and that "Janas was assigned to observe [Montgomery] for his own protection [did] not transform [Montgomery's] statement into a protected communication under the psychiatrist-patient privilege. A contrary determination would extend that privilege well beyond the plain statutory language that defines it." Id.

Both DMHAS and Justice Keller in her dissenting opinion contend that our decision in *Falco* v. *Institute of Living*, 254 Conn. 321, 757 A.2d 571 (2000), adopted a far broader construction of "communications and records," one that includes *all* communications and records that were made at or prepared in a mental health facility and that identify a patient. See part II of the dissenting opinion. We cannot agree that our decision in *Falco* construed § 52-146d (2) to encompass communications beyond the limited categories set forth

in the statutory definition. Indeed, *Falco* did not address—much less adjudicate—the definition of "communications and records" in § 52-146d (2) because the parties in that case agreed that "§ 52-146e control[led] and that no appropriate statutory exception [to the psychiatrist-patient communications privilege] applie[d]." Id., 325. Instead, the issue before us in *Falco* was whether the trial court could exercise its discretion to override the psychiatrist-patient communications privilege and to order a bill of discovery requiring the disclosure of a mental health patient's name, last known address, and social security number due to "compelling countervailing interests not explicitly recognized by the legislature." (Internal quotation marks omitted.) Id. In light of the plain language of § 52-146e (a), which "specifically prohibits the disclosure or transmission of any communications or records that would 'identify a patient' "; id., 329; and the absence of an applicable statutory exception, we concluded that it was "contrary to the language of the statute and the intent of the legislature for courts to make discretionary case-by-case determinations of when the privilege may be overridden." Id., 331. We recognized that communications unrelated to the purpose for which the privilege was enacted are not protected from disclosure but determined that the identity of a patient is related to the purpose of the psychiatrist-patient communications privilege because "[t]he confidentiality of a patient's identity is as essential to the statutory purpose of preserving the therapeutic relationship as the confidentiality of any other information in a patient's communications and records." Id., 329.

*Falco* does not stand for the unjustifiably broad proposition that the psychiatrist-patient communications privilege prohibits the disclosure of *all* documents or information prepared at a mental health facility from which a patient can be identified. The scope of the statutory definition was not at issue in that case.[11] Our statements in *Falco* regarding the privileged nature of communications that identify a patient must be understood in the context in which they were made, i.e., in response to an argument that information identifying a patient is not privileged because it is unrelated to the purpose for which the psychiatrist-patient communications privilege was enacted. We rejected this notion, reasoning that the protection of a patient's identity within confidential communications is essential to the statutory purpose of preserving the therapeutic relationship and shielding patients from the stigma of seeking psychiatric care. Id. Any suggestion that our holding in *Falco* expanded the definition of "communications and records" in § 52-146d (2) beyond its plain language is unfounded.

In *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, 318 Conn. 769, 122 A.3d 1217 (2015)

(*Freedom of Information Officer*), we reinforced our commitment to the plain language of the statutory definition. In that case, we addressed whether medical and dental records prepared at a mental health facility and maintained in the patient's clinical file were "communications and records," as defined by § 52-146d (2). See id, 783–89 and n.8. We concluded that the medical and dental records at issue in that case were "not communications directly between [the patient] and a psychiatrist or between a member of [the patient's] family and a psychiatrist." Id., 783. Nevertheless, we noted that "the definition of [c]ommunications and records in § 52-146d (2) does not stop there. Section 52-146d (2) further defines [c]ommunications and records to include all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition . . . *between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility* . . . ." (Emphasis added; internal quotation marks omitted.) Id. We held that this third category of "communications and records thereof" was applicable because there was evidence "that the medical and dental records at issue were created at the hospital during [the patient's] inpatient treatment" and "under the direction of a psychiatrist," who was "the superintendent of the facility at the time [the patient]" was receiving treatment. Id., 785–86. We twice noted that the records were maintained as part of the patient's clinical file at the hospital. Id., 783, 790. Additionally, we recognized that General Statutes § 17a-545 reflects a legislative judgment that "mental health conditions are often related to physical disorders and that the proper treatment of mental health involves the treatment of physical issues as well." Id., 790–91; see General Statutes § 17a-545 (requiring inpatient mental health facilities to conduct physical examinations of patients). Because the medical and dental records were "created by an inpatient mental health facility during the treatment of a patient" and were related to the objectives of the patient's diagnosis and treatment, we held that they satisfied the statutory definition of "communications and records" in § 52-146d (2) and were exempt from disclosure under FOIA. *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, supra, 791; see id., 786.

Both Chief Justice Robinson, in his concurring and dissenting opinion, and Justice Keller, in her dissenting opinion, contend that our holding in *Freedom of Information Officer* requires us to conclude that the police report in the present case falls within the statutory privilege. See, e.g., part I of the dissenting opinion. We see a world of difference, however, between the

operative facts of that case and this one. *Freedom of Information Officer* involved the disclosure of medical and dental records that were part of the patient's clinical file at the psychiatric facility and were prepared at a time when the patient was receiving treatment from persons who were participating in the accomplishment of the objectives of diagnosis and treatment. See *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission,* supra, 318 Conn. 780, 783, 790. In contrast, the police report at issue in this case was not a part of the patient's clinical file and was prepared after the patient had stopped receiving treatment at Whiting. Given the nature and timing of the postmortem investigation conducted by the DMHAS police officers, it is clear that the officers who produced the report were not participating in the accomplishment of the objectives of diagnosis and treatment when they authored the report but, instead, were performing the traditional law enforcement function of investigating an untimely death. See part III A 2 of this opinion. Accordingly, the report is not a communication or record protected by the statutory psychiatrist-patient communications privilege.[12]

DMHAS also argues that the plain language of § 52-146d (2) encompasses all communications and records of communications made at or prepared in a mental health facility relating to the diagnosis and treatment of a patient's mental condition, regardless of the identity of the communicants, because the final clause of the statute expands the definition of "communications and records" to include all communications and records thereof "*wherever made, including communications and records which occur in or are prepared at a mental health facility* . . . ." (Emphasis added.) General Statutes § 52-146d (2). According to DMHAS, the phrase "including communications and records which occur in or are prepared at a mental health facility" must be construed expansively because, otherwise, the phrase "wherever made" would be superfluous, contrary to our rules of statutory construction. See, e.g., *Semerzakis* v. *Commissioner of Social Services*, 274 Conn. 1, 18, 873 A.2d 911 (2005) ("[s]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant" (internal quotation marks omitted)).

We find no merit in this argument. We previously have held in other statutory contexts that the word "including" is ambiguous because it typically is unclear whether it is "intended as a word of limitation . . . or one of enlargement . . . ." (Internal quotation marks omitted.) *State* v. *DeFrancesco*, 235 Conn. 426, 435, 668 A.2d 348 (1995); see, e.g., *Hartford Electric Light Co.* v. *Sullivan*, 161 Conn. 145, 150, 285 A.2d 352 (1971) (noting that term " 'include' is primarily defined as a term of limitation" but also "can be a term of enlarge-

ment"). We therefore turn to extratextual sources of legislative intent to determine whether the legislature intended to protect *all* communications and records of communications created in a mental health facility, regardless of whether they are "between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment . . . ." General Statutes § 52-146d (2).

The phrase "wherever made, including communications and records which occur in or are prepared at a mental health facility," was added to the statutory scheme in 1969 as part of a comprehensive overhaul of the psychiatrist-patient communications privilege. See Public Acts 1969, No. 819, § 1. According to the legislative history,[13] the purpose of No. 819 of the 1969 Public Acts was to balance the legitimate needs of researchers to access confidential psychiatric communications with the privacy interests of patients. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1969 Sess., p. 92, remarks of Ben Bursten, a psychiatrist (explaining that statute "represents a delicate balance between the patient's rights and the advantages offered by the new technology" of computerized research, thus "allow[ing] research and administration to proceed while safeguarding the confidentiality of the patient's communications"); id., pp. 100–101, statement of Gerald L. Klerman, a psychiatrist and the director of the Connecticut Mental Health Center ("This [b]ill recognizes these new advances and expanding needs [arising from new information technology, new forms of treatment, and new forms of mental health organizations]. It balances the rights of individuals with the needs of society. It allows for [the] collection of data for administrative planning and research while providing safeguards for patients' privacy and confidentiality." (Internal quotation marks omitted.)). The amendment was intended to clarify that the psychiatrist-patient communications privilege is not limited to communications between patients and private psychiatrists but also extends to communications relating to psychiatric treatment provided at publicly funded institutions that offer inpatient treatment. See id., p. 82, remarks of Representative Mary B. Griswold ("[w]e do have protection of private patients but it has never been clearly stated that such privacy extends to patients in public institutions"); id., p. 99, remarks of Attorney John Rose ("I think that it's a terrifically important bill because it protects all patients' confidentiality including that of the indigent person being treated in a state hospital"). There is no indication that the legislature intended to adopt a broader privilege, applicable only to records created at mental health facilities, that applies regard-

less of the express limitations contained in the statutory definition relating to the identities of the communicants and the content of the communications. To the contrary, the purpose of the amendment was, in part, to create a uniform standard applicable to all communications or records thereof relating to psychiatric treatment, regardless of the setting in which the psychiatric treatment is provided.

In light of the legislative history and the purpose of the statute, we conclude that the phrase "including communications and records which occur in or are prepared at a mental health facility" was not intended to create a freestanding category of confidential communications and records unique to mental health facilities but, instead, was intended "as an illustrative application of 'wherever made' . . . ." *Skakel* v. *Benedict*, 54 Conn. App. 663, 673, 738 A.2d 170 (1999); see id., 673–74 (rejecting claim that definition of "communications and records" is limited to confidential communications "between designated parties that occurred in or were prepared at a mental health facility" and concluding that mental health facility is just illustrative application of " 'wherever made' "). We reject DMHAS' claim that all communications and records thereof prepared in a mental health facility that identify a patient are privileged under § 52-146e (a), regardless of whether they were communications between the individuals identified in the three categories of communicants delineated in § 52-146d (2).

Justice Keller criticizes our construction of the statutory scheme on the grounds that it creates "a two tiered system for applying the psychiatrist-patient privilege" and contravenes the legislature's stated "intent to provide the same level of protection to the psychiatric records of persons who receive treatment from a public mental health institution as that afforded to the records of persons who receive treatment from a private mental health care provider." The dissenting opinion also states that we have implicitly added a FOIA "exception" to the privilege, such that an otherwise privileged document becomes disclosable if requested under FOIA. Footnote 5 of the dissenting opinion. This criticism misses the mark. Section 52-146e (a) has the same coverage and limitations regardless of whether the patient seeks treatment at a state operated mental health treatment facility or a private hospital. The communications and records of patients who seek treatment at a private mental health treatment facility are not inviolate; they are subject to disclosure under § 52-146e (a) to the same extent and in the same manner as the communications and records of patients who seek treatment at a public mental health facility.[14] Conversely, the communications and records of patients who seek treatment at a public mental health facility are not inferior or entitled to less protection; they are privileged in accordance with the dictates of §§ 52-146d (2) and 52-146e (a). If

a communication is privileged, it may not be disclosed under FOIA.[15]

This case illustrates the inherent tension between the competing public policy objectives of governmental transparency and patient confidentiality. "From the beginning, the history of [FOIA] has been one of tension between the principle of open government and those circumstances [in which] superior public interest requires confidentiality." (Internal quotation marks omitted.) M. Burke, "The Freedom of Information Act and Its Exceptions," 91 Conn. B.J. 350, 366 (2018). We acknowledge "the unfortunate reality that a stigma may attach to one who seeks psychiatric care . . . and that revealing a patient's identity may subject him or her to embarrassment, harassment or discrimination." *Falco* v. *Institute of Living*, supra, 254 Conn. 329. We agree with our dissenting colleagues that this is a concern worthy of very serious consideration. On the other hand, however, we must also acknowledge the unfortunate and undeniable reality that governmental secrecy can be used to conceal governmental abuse, corruption, and neglect. Cf. *National Labor Relations Board* v. *Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S. Ct. 2311, 57 L. Ed. 2d 159 (1978) ("[t]he basic purpose of [the federal Freedom of Information Act] is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed").[16] In enacting FOIA, the legislature balanced these competing principles and provided, as it deemed appropriate, for certain exemptions from disclosure to protect patient confidentiality. For example, there is a specific FOIA exemption for "medical files and similar files the disclosure of which would constitute an invasion of personal privacy"; General Statutes § 1-210 (b) (2); which is not at issue in this appeal. See footnote 4 of this opinion. There also is an exemption for records that "may result in a safety risk, including the risk of harm to any person or the risk of an escape from, or a disorder in, a . . . facility under the supervision of . . . Whiting Forensic Hospital." General Statutes § 1-210 (b) (18).[17] Most notably for present purposes, however, FOIA does not contain a blanket exemption from disclosure for all records and documents relating to patients at Whiting or other public mental health facilities, and we cannot expand the statutory privilege by construction, even if we believed that the relevant considerations warrant broader coverage. See *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 550, 93 A.3d 1142 (2014) ("we deem balancing the various interests and articulating a coherent policy on [FOIA exemptions] to be a uniquely legislative function"); *State* v. *Whiteman*, 204 Conn. 98, 103, 526 A.2d 869 (1987) ("[i]n areas [in which] the legislature has spoken . . . the primary responsibility for formulating public policy must remain with

the legislature"). The decision whether the public policy of this state would best be served by creating such an exemption to protect the confidentiality of patient information, or by requiring the disclosure of such information to ensure governmental accountability for the proper care and maintenance of mental health patients, who are some of the most vulnerable members of our population, is one that rests with the legislature.

2

### Substantial Evidence To Support the Commission's Decision

We next address whether there is substantial evidence in the administrative record to support the commission's finding that the police report is not a communication or record thereof, as defined by § 52-146d (2). "An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (Internal quotation marks omitted.) *Stratford Police Dept.* v. *Board of Firearms Permit Examiners*, 343 Conn. 62, 81, 272 A.3d 639 (2022). The substantial evidence standard requires courts to defer to agency findings in the absence of a strong reason to intervene: "[I]t is [not] the function of the trial court [or] of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion." (Citation omitted; internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 668–69, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001).

As we explained previously, the evidence adduced at the administrative hearing consisted of the testimony of Lejardi and the police report in both redacted and unredacted form. Our in camera review of the police report reveals that it is a collection of investigative reports, each typewritten on a standard form entitled "POLICE CASE/INCIDENT REPORT" and authored by various members of the DMHAS Police Department as part of its investigation into a patient's death. Ten of

these reports were written by the DMHAS police officer primarily assigned to investigate the matter, Detective Thomas M. Ruggerio, who was not present at the time of the underlying events. Ruggerio's reports, which comprise thirty of the report's forty-one pages, include his narrative of witness interviews conducted by him, as well as timelines and narratives created by him upon review of video and audio recordings of some of the relevant events.[18] The other five reports were written by other DMHAS police officers.[19] A few of the reports were created within twenty-four hours after the patient's death. Most of them were created over the next eight days. There are two later reports, dated March 31, 2017, and April 26, 2017, which document Ruggerio's release of the complete narrative of the investigation, video footage, photographs and related information to the state police, Ruggerio's receipt of the medical examiner's autopsy report, and the closure of the investigation.[20]

Having reviewed Lejardi's testimony and the police report in camera, we conclude that substantial evidence supports the commission's determination that the report is not a communication or record thereof, as defined by § 52-146d (2). The police report, which was generated after the death of a patient at Whiting, is not a communication "between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment . . . ." General Statutes § 52-146d (2). Instead, it is a communication between the DMHAS police officers tasked with investigating a patient's death and an unknown recipient or recipients. Regardless of whether the intended recipient was the captain of the DMHAS police force, the state police, or, more speculatively, a "psychiatric mental health provider," as defined by § 52-146d (7),[21] given the death of the patient who is the subject of the report, it clearly appears that the officers were not participating in the accomplishment of the objectives of diagnosis and treatment at the time the report was produced. Rather, the DMHAS police officers were performing the traditional law enforcement function of investigating an unnatural death and reporting the results of their investigation. On the present administrative record, we cannot conclude that the commission acted arbitrarily, illegally, or in abuse of its discretion in finding that the police report was not a communication or record within the meaning of the statutory scheme.

In their respective opinions, Chief Justice Robinson and Justice Keller arrive at the opposite conclusion on the basis of their review of the administrative record. Specifically, they would find that the DMHAS police officers who responded to the emergency medical event

suffered by the patient on December 1, 2016, were participating "in the accomplishment of the objectives of diagnosis and treatment" within the meaning of § 52-146d (2). See, e.g., part I of the dissenting opinion. That conclusion is flawed for three reasons. First, the proper focus of the privilege inquiry for present purposes is the police report itself, because that is the communication or record thereof at issue. We have seen nothing in the record supporting (much less compelling) the conclusion that the DMHAS officers were participating in the accomplishment of the objectives of diagnosis and treatment at the time they wrote the report.

Second, turning from the authors of the report to its intended recipient, we reiterate that a document does not qualify as a communication or record thereof within the meaning of § 52-146d (2) unless the intended recipient of the communication also falls within one of the three protected categories of communicants identified therein. As we previously explained, there is no evidence in the record indicating the intended recipient of the police report, and, without such evidence, we are unable to discern any basis for the assertions in the dissenting opinions that the police report is a communication or record thereof.

Third, although some DMHAS police officers responded to the emergency medical event involving the patient, it is unclear from the record whether, as Chief Justice Robinson concludes, they were participating "in their capacity as part of the psychiatric treatment team" or, alternatively, performing the traditional law enforcement function of coordinating an emergency response to a medical event. As Chief Justice Robinson acknowledges, "no officer provided emergency medical treatment to the patient . . . ." Indeed, there is no evidence to suggest that the responding officers had any physical or verbal interaction of any kind with the patient. Given the ambiguity in the administrative record, we are not at liberty to substitute our own judgment for that of the commission.

To be clear, we do not suggest, as Justice Keller implies, that the police report does not "relat[e] to diagnosis or treatment of a patient's mental condition" within the meaning of § 52-146d (2). (Internal quotation marks omitted.) Part I of the dissenting opinion. It clearly does. Rather, we hold that the police report at issue in this case is not a protected psychiatrist-patient communication or a record of such a communication between the patient, a member of the patient's family, or a mental health provider and "a person *participating . . . in the accomplishment of the objectives of diagnosis and treatment . . . .*" (Emphasis added.) General Statutes § 52-146d (2). Although the police report contains information related to the patient's psychiatric diagnosis and treatment, at the time the police report was generated, the DMHAS police officers were not participating in

the diagnosis and treatment of the patient but, instead, were participating in an investigation into the cause of the patient's untimely death and the adequacy of DMHAS' response to the patient's emergency medical event.[22]

In reaching this conclusion, we are fully cognizant that, even though the police report itself is not a privileged psychiatrist-patient communication, it might contain the substance, part, or resume of some discrete, privileged, psychiatrist-patient communications between the individuals identified in the three categories of communicants delineated in § 52-146d (2). As Justice Keller correctly points out in her dissenting opinion, all allegedly privileged psychiatrist-patient communications contained in documents "must be evaluated on two levels": (1) whether the document itself is a protected communication or record thereof, as defined by the statutory scheme, and (2) if not, whether it memorializes communications between any of the three sets of communicants within the statutory definition. Part I of the dissenting opinion. With respect to this second level analysis, Justice Keller concludes that the police report memorializes some privileged, premortem "communications among mental health staff and between mental health staff and the patient." Id. Whatever the validity of this observation, however, DMHAS did not raise this claim before the commission or the trial court. Nor has DMHAS raised this claim on appeal. Indeed, DMHAS never asked the commission, the trial court, or this court to redact any of the alleged second level, privileged communications identified by Justice Keller. Given that this claim is not preserved for our review or presented to us on appeal, we decline to address it. See, e.g., *State* v. *Connor*, 321 Conn. 350, 362, 138 A.3d 265 (2016) ("Our appellate courts generally do not consider issues that were not raised by the parties. . . . This is because our system is an adversarial one in which the burden ordinarily is on the parties to frame the issues . . . ." (Citation omitted; internal quotation marks omitted.)).

For the foregoing reasons, we conclude that the police report is not privileged under §§ 52-146d (2) and 52-146e (a).[23] Nonetheless, we note that the police report contains sensitive information regarding the identity of two mental health patients, which DMHAS consistently has sought to redact throughout this litigation. Specifically, the report contains the name, date of birth, and home phone number of the patient whose death was under investigation, as well as the same information regarding a second patient who witnessed the medical event that led to the first patient's death. Kovner, however, never requested any patient identifying information under FOIA. Indeed, Kovner explicitly qualified his public records request by stating that "[a]ll references to the identity of a patient can be redacted." Given that patient identifying information was not requested, the

commission erred in ordering the disclosure of this information over the objection of DMHAS.[24] Accordingly, all references to patient names, dates of birth, and home phone numbers must be redacted.

## B

### HIPAA

Having determined that the police report must be disclosed pursuant to FOIA, we must address whether it is nonetheless protected from disclosure "as otherwise provided by any federal law . . . ." General Statutes § 1-210 (a). DMHAS claims that the police report is protected from disclosure by HIPAA, as implemented by the Privacy Rule, because DMHAS is a "covered entity" and the report contains protected "health information" under 45 C.F.R. § 160.103.

FOIA "expressly exempts from the act any information that is protected from disclosure under federal law." *Commissioner of Correction* v. *Freedom of Information Commission*, supra, 307 Conn. 81; see General Statutes § 1-210 (a). HIPAA's Privacy Rule generally prohibits a "covered entity" from using or disclosing protected "health information" without a valid authorization. 45 C.F.R. § 164.508 (a) (1) (2021). Health plans, health care clearinghouses, and health care providers are covered entities. Id., § 160.103. "Health information" is "any information . . . that: (1) Is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." Id.

There are various exemptions pursuant to which a covered entity may disclose protected health information under HIPAA without a valid authorization. See id., § 164.512. Pertinent to the present appeal, "[a] covered entity may use or disclose protected health information *to the extent that such use or disclosure is required by law and the use or disclosure complies with and is limited to the relevant requirements of such law.*" (Emphasis added.) Id., § 164.512 (a) (1). "*Required by law* means a mandate contained in law that compels an entity to make a use or disclosure of protected health information and that is enforceable in a court of law. *Required by law* includes, but is not limited to, court orders and court-ordered warrants; subpoenas or summons issued by a court, grand jury, a governmental or tribal inspector general, or *an administrative body authorized to require the production of information* . . . and *statutes* or *regulations that require the production of information* . . . ." (Emphasis altered.) Id., § 164.103.

FOIA is a state statute that requires the production

of public records, and, therefore, health information is not protected by HIPAA if its disclosure is required by FOIA. As the commentary to the Privacy Rule states: "These rules permit covered entities to make disclosures that are required by state [f]reedom of [i]nformation . . . laws under § 164.512 (a). Thus, if a state [freedom of information] law designates death records and autopsy reports as public information that must be disclosed, a covered entity may disclose it without an authorization under the rule. To the extent that such information is required to be disclosed by [freedom of information laws] or other law[s], such disclosures are permitted under the final rule." Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82,462, 82,597 (December 28, 2000); see id., 82,666–67 (Section 164.512 (a) "permits covered entities to use or disclose protected health information when they are required by law to do so. . . . [W]e intend this provision to preserve access to information considered important enough by state or federal authorities to require its disclosure by law.").[25]

Even if we assume, without deciding, that the DMHAS Police Department is a "covered entity" and that the police report contains "health information," as defined by the Privacy Rule, the police report nonetheless is not protected from disclosure under HIPAA because its release is "required by law" under FOIA.[26] 45 C.F.R. § 164.512 (a) (2021); see part III A of this opinion. We therefore conclude that the police report must be disclosed, provided that the names, dates of birth, and home phone numbers of the two patients mentioned therein are redacted.

The judgment is reversed in part and the case is remanded with direction to reverse in part the decision of the commission and to order the release of a version of the police report that redacts only the names, dates of birth, and home phone numbers of the patients referred to therein; the judgment is affirmed in all other respects.

In this opinion McDONALD, MULLINS and CRADLE, Js., concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices D'Auria, Mullins, Ecker and Keller. Thereafter, Justice McDonald and Judge Cradle were added to the panel and have read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

[1] After the events at issue in this appeal, Whiting separated from Connecticut Valley Hospital and became an independent division of the plaintiff Department of Mental Health and Addiction Services. See Executive Order No. 63 (January 2, 2018); see also General Statutes § 17a-560.

[2] The Hartford Courant and Kovner were the complainants before the commission and were named as defendants in the administrative appeal, but they did not participate therein. Kovner died while the present case was pending in the trial court. There is no claim that his death affects the status of this appeal.

[3] General Statutes § 52-146e (a) provides: "All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose

or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative."

The phrase "communications and records" is defined in § 52-146d (2) as "all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ."

Although § 52-146d was the subject of technical amendments in 2019; see Public Acts 2019, No. 19-98, § 24; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[4] The commission reasoned that the police report did not fall within the scope of the personal privacy exemption because it is "a police report of a death and did not contribute to [the] making [of] a medical decision," the patient's right of personal privacy did not survive his death, and, "[e]ven if the [patient's] privacy rights survived his death, the [police report] is a legitimate matter of public concern, and disclosure of it would not be highly offensive to a reasonable person." See General Statutes § 1-210 (b) (2) (exempting "[p]ersonnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy"). DMHAS does not challenge this determination on appeal, and, therefore, we do not address whether the police report is exempt from disclosure under § 1-210 (b) (2).

[5] General Statutes § 52-146d (4) provides that the terms " '[i]dentifiable' and 'identify a patient' refer to communications and records which contain (A) names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to, or (B) codes or numbers which are in general use outside of the mental health facility which prepared the communications and records . . . ."

[6] The commission appealed and DMHAS cross appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal and cross appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[7] The term "resume" is not defined in the statutory scheme, but, as used in § 52-146e, it appears to refer to "a summing up . . . [or] a condensed statement . . . ." Webster's Third New International Dictionary (2002) p. 1937.

[8] We have characterized the psychiatrist-patient privilege as "broad" because it is not limited to communications between the patient and the psychiatrist "but also [extends to] all communications relating to the patient's mental condition between the patient's family and the psychiatrist and his staff and employees, as well as records [thereof] prepared at mental health facilities." (Internal quotation marks omitted.) *State* v. *Kelly*, 208 Conn. 365, 379, 545 A.2d 1048 (1988).

[9] The term "thereof" plainly and unambiguously refers to communications, that is, records *of communications*. See Webster's Third New International Dictionary (2002) p. 2372 (defining "thereof" as "of that: of it" or "from that cause: from that particular").

[10] The word "participate" means "to take part in something (as an enterprise or activity) [usually] in common with others . . . ." Webster's Third New International Dictionary (2002) p. 1646.

[11] We disagree with Justice Keller that we "incorrectly [represent] this court's analysis" in *Falco*. Part II of the dissenting opinion. Nowhere in *Falco* did we discuss the meaning of the statutory definition of "communications and records" in § 52-146d (2). As Justice Keller points out; see id.; we did discuss the meaning of the term "identify a patient" in § 52-146d (4), stating that "the phrase ' "identify a patient" refer[s] to communications and records which contain (A) names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to, or (B) codes or numbers which are in general use outside of the mental health facility which prepared the communications and records . . . .' " *Falco* v. *Institute of Living*, supra, 254 Conn. 329, quoting General Statutes § 52-146d (4). Nothing in our discussion of subdivision (4) of § 52-146d was intended to expand, either implicitly or explicitly, the statutory definition of "communications and records" in subdivision (2)

of that statute beyond its plain language.

[12] As we explain in greater detail in part III A 2 of this opinion, there is substantial evidence in the administrative record to support the commission's finding that DMHAS did not make the required showing that the police report falls within the definition of "communications and records" in § 52-146d (2).

[13] DMHAS claims that we cannot consider the legislative history underlying the definition of "communications and records" in § 52-146d (2) because the commission failed to rely on the legislative history in the trial court, and, therefore, the commission's argument is not preserved for our review. We reject this contention. Because we have determined that § 52-146d (2) is ambiguous, we are permitted by statute to resolve the ambiguity by considering extratextual sources of legislative intent, such as legislative history. See General Statutes § 1-2z (permitting resort to "extratextual evidence" if statutory language is ambiguous or yields absurd or unworkable results). Indeed, once the text of a statute has been deemed to be ambiguous or absurd and unworkable, consideration of legislative history undoubtedly falls within our "independent power to identify and apply the proper construction of governing law . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 148, 84 A.3d 840 (2014). Our task is to ascertain the meaning of the statute, and the means available to us are not limited to the arguments made previously by the parties.

[14] To illustrate, if the very same events that occurred in the present case had taken place at a private hospital, a police report created under the same conditions would not be privileged from disclosure under § 52-146e (a).

[15] Any differential treatment between public and private institutions with respect to communications and records that are not privileged under §§ 52-146d (2) and 52-146e (a) derives solely from the applicability of FOIA, the very purpose of which is to provide access to public records. See, e.g., *Stamford* v. *Freedom of Information Commission*, 241 Conn. 310, 314, 696 A.2d 321 (1997) ("[t]he sponsors of [FOIA] understood the legislation to express the people's sovereignty over the agencies [that] serve them . . . and this court consistently has interpreted that expression to require diligent protection of the public's right of access to agency proceedings" (internal quotation marks omitted)).

[16] Like the federal Freedom of Information Act; see 5 U.S.C. § 552 (2018); our state FOIA was enacted "in the aftermath of the Vietnam War and Watergate . . . [when] people were fed up with furtive government" and had "los[t] faith in government and politicians." M. Burke, supra, 91 Conn. B.J. 350. As we previously have recognized, "the purposes of the federal act and of our act are virtually identical . . . ." (Citations omitted.) *Board of Trustees* v. *Freedom of Information Commission*, 181 Conn. 544, 553, 436 A.2d 266 (1980).

[17] This exemption, which mentions Whiting by name, reflects the legislature's awareness of the need to modify FOIA's disclosure requirements to accommodate the needs of Whiting and its patient population.

[18] The incident reports contain Ruggerio's narrative of interviews with seven members of the hospital staff and one patient who witnessed some of the event.

[19] Two of the incident reports contain the respective officers' narrative describing their own on scene observations of the medical incident.

[20] The police report references other documents and information either created or reviewed by the DMHAS police officers in the course of their investigation, including video footage of the event under investigation from cameras located at various locations within the hospital, photographs of the scene taken by the DMHAS police, and the autopsy report of the patient produced by the medical examiner. The police report indicates that, prior to providing information to the state police, DMHAS obtained from all of the patients who appeared in the video footage releases authorizing the disclosure of their protected health related information. This is the only reference in the police report to the subject of patient confidentiality.

[21] There is no evidence in the record that the intended recipient was a "psychiatric mental health provider," a term defined by statute as "a physician specializing in psychiatry and licensed under the provisions of sections 20-9 to 20-12, inclusive, an advanced practice registered nurse licensed under chapter 378 who is board certified as a psychiatric mental health provider by the American Nurses Credentialing Center, a person licensed to practice medicine who devotes a substantial portion of his or her time to the practice of psychiatry or a person reasonably believed by the patient to be so qualified." General Statutes § 52-146d (7).

[22] Justice Keller concludes that individuals in the third category of communicants need not "participate in diagnosis or treatment directly" and that it is enough that their role "is one that serves the accomplishment of the objectives of diagnosis and treatment . . . ." (Internal quotation marks omitted.) Part I of the dissenting opinion. This construction of § 52-146d (2) reads the word "participating" out of the statutory definition, contrary to our well established rules of statutory construction. See, e.g., *Vibert* v. *Board of Education*, 260 Conn. 167, 176, 793 A.2d 1076 (2002) ("[e]very word and phrase is presumed to have meaning, and we do not construe statutes so as to render certain words and phrases surplusage" (internal quotation marks omitted)).

[23] Because the police report is not a protected psychiatrist-patient communication or record thereof under §§ 52-146d (2) and 52-146e (a), we do not address whether it will "identify a patient" or render a patient "identifiable" within the meaning of § 52-146d (4). See General Statutes § 52-146d (4) (" '[i]dentifiable' and 'identify a patient' refer to *communications and records which contain* (A) names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to, or (B) codes or numbers which are in general use outside of the mental health facility which prepared the communications and records" (emphasis added)). We also do not address whether, on different facts, a communication or record thereof created after the death of a patient might fall within the protection of § 52-146e (a). See part I of the dissenting opinion.

[24] Contrary to Justice Keller's contention, we do not suggest that "the redaction of the patient's name is somehow sufficient to safeguard the patient's privilege . . . ." Part II of the dissenting opinion. We hold, rather, that the police report is not privileged and that there is no claim before us that the report memorializes or summarizes discrete, premortem, privileged communications between any of the individuals identified in the three categories of communicants delineated in § 52-146d (2). The names, dates of birth, and home phone numbers of the patients must be redacted because this information was not requested under FOIA and, therefore, is not required to be disclosed under the statutory scheme.

[25] Our sister state courts uniformly have determined that public records required to be disclosed under state freedom of information laws are not protected from disclosure by HIPAA, even if they were produced by a "covered entity" and contain "health information . . . ." 45 C.F.R. § 164.508 (a) (1) (2021); see *State ex rel. Adams County Historical Society* v. *Kinyoun*, 277 Neb. 749, 756, 765 N.W.2d 212 (2009) (burial records were not protected by HIPAA because they were required to be disclosed under Nebraska's public records law, and "HIPAA can and does give way to state laws requiring disclosure of certain kinds of information"); *State ex rel. Cincinnati Enquirer* v. *Daniels*, 108 Ohio St. 3d 518, 526, 844 N.E.2d 1181 (2006) (concluding that public record subject to disclosure under Ohio Public Records Law was not protected by HIPAA, "even if . . . [it] did contain 'protected health information' as defined by HIPAA, and even if the [public agency] operated as a 'covered entity' pursuant to HIPAA"); *Oregon Health & Science University* v. *Oregonian Publishing Co., LLC*, 362 Or. 68, 86, 403 P.3d 732 (2017) ("[f]ollowing the guidance provided in the Privacy Rule commentary, a covered entity responding to a public records request often could comply with both HIPAA and a law requiring disclosure of public records . . . under HIPAA's 'required by law' exception"); *Abbott* v. *Dept. of Mental Health & Mental Retardation*, 212 S.W.3d 648, 660 (Tex. App. 2006) (statistics regarding allegations of patient abuse at Texas state facilities were not protected from disclosure by HIPAA because Texas' "Public Information Act is a statute requiring the disclosure of protected health information as described in [§] 164.512 (a) of the Privacy Rule").

[26] During oral argument before this court, counsel for DMHAS conceded that, if the police report must be disclosed by FOIA, then it is not protected from disclosure by HIPAA.